[L.A. No. 29689. In Bank. Feb. 23, 1971.]

FRED H. BIXBY, Plaintiff and Appellant, v.
ANTHONY R. PIERNO, as Commissioner of Corporations,
Defendant and Respondent;
FRED H. BIXBY RANCH COMPANY, Real Party in Interest and
Respondent;
ROBERT BIXBY GREEN, Intervener and Appellant.

## COUNSEL

Shaw, Miller & Suffin, Stephen H. Suffin, Loeb & Loeb and Howard I. Friedman for Plaintiff and Appellant and for Intervener and Appellant.

Thomas C. Lynch, Attorney General, Arthur C. de Goede, Deputy Attorney General, for Defendant and Respondent.

Gibson, Dunn & Crutcher, Arthur W. Schmutz, Robert S. Warren and Martin H. Kahn for Real Party in Interest and Respondent.

## OPINION

**TOBRINER, Acting C. J.**—In this case we are called upon to determine whether a superior court properly refused to exercise its independent judgment in reviewing a decision of the Commissioner of Corporations approving a recapitalization plan. For the reasons stated herein, we conclude that the judgment must be affirmed: the trial court properly followed our long established approach to the judicial review of a decision of a statewide non-constitutional agency, and applied to the decision the test of whether or not it was supported by substantial evidence. The trial court correctly found that the commissioner's ruling was supported by substantial evidence and did not constitute an abuse of discretion.

### 1. *The facts.*

Plaintiff, Fred H. Bixby, and intervener, Robert Bixby Green, appeal from a judgment denying their petition for writ of mandamus (Code Civ. Proc., § 1094.5) to compel defendant Commissioner of Corporations of the State of California[1] to set aside his decision approving a recapitalization plan submitted for approval by real party in interest, Fred H. Bixby Ranch Company, a California corporation (hereinafter called "Ranch Company"). The Ranch Company is a closely held, family-owned corporation with 68,400 shares of capital stock outstanding. Almost all of this stock is owned or held in trust for the children, grandchildren and great-grandchildren of the corporation's founder, Fred H. Bixby, now deceased. Although no single shareholder owns a majority of the stock, Preston B. Hotchkis, the president and a director of Ranch Company, owns or controls as voting trustee approximately 39 percent of the stock, and his parents, brother and sisters own or control an additional 13 percent. The remaining stock is held

---

[1]During the pendency of proceedings in this case the court received from the Superior Court of the County of Los Angeles a certified copy of an order of substitution and stipulation that Anthony R. Pierno became the duly qualified Corporations Commissioner for the State of California on February 11, 1969. Robert H. Volk was the Corporations Commissioner, and he was named defendant and respondent when the court granted a hearing in this case. On January 19, 1970, this court ordered that Anthony R. Pierno be substituted as respondent in the present case. We now entitle the proceedings as shown above.

primarily by descendants of Fred H. Bixby, such as plaintiff Bixby and intervener Green (hereinafter called minority stockholders), who are not members of the Hotchkis family.

Ranch Company's board of directors (of which president Hotchkis and his father are members) became concerned with the possibility that an outsider, attracted by the high liquidation value of the corporation's stock, might acquire control of the corporation by purchasing stock from the estates of deceased shareholders and thereupon force a liquidation. Although Ranch Company has no provision for redemption of its stock upon death, it has adopted an informal policy of purchasing from the estates of deceased shareholders sufficient shares to enable the estate to meet the costs of death taxes and administration. Upon the last occasion of a shareholder's death, however, an outsider did bid for the shares offered for sale by the estate.

Ranch Company owns substantial real estate holdings and has commenced development of this property through long-term projects. The corporation is managed in part by officers who are not shareholders of the corporation, and the directors believe it is necessary to assure these officers that Ranch Company will be in a position, through continuity and stability of ownership, to carry out its long-term plans.

Consequently, in order to insure the continuity of ownership of this family corporation and to assure the stability of its long-term real estate development projects, the board of directors, by a 3 to 2 vote, adopted, with the approval of approximately 70 percent of the shareholders, a plan of recapitalization. The plan contemplates the creation of a new class of 68,400 shares of nonconvertible, nonvoting preferred stock carrying a cumulative annual dividend of $5 per share and an additional noncumulative annual dividend of $2 per share. In the event of liquidation, each preferred share will be entitled to receive $400 plus accrued dividends.

The plan also provides for the creation of a new class of 68,400 shares of common stock which, with certain exceptions pertaining to dividend arrearages and liquidation preferences, are to have exclusive voting rights. These new common shares are to be exchanged on a one-for-one basis for the old common shares; the preferred shares will then be issued pro rata as a dividend upon the new common shares.

If the plan is carried out, the distribution of the new common and preferred shares will be in the same proportion as present holdings; each shareholder will possess the same ownership interest, rights, and privileges as he formerly possessed. In the event of a shareholder's death, however, his estate may elect to sell the nonvoting preferred stock to raise funds for the payment of death taxes and expenses of administration, thereby retaining the voting

common stock for distribution to his heirs. The plan thereby diminishes the danger that outsiders might obtain control of the corporation by purchase of voting stock upon the death of shareholders.

The minority shareholders in Ranch Company objected to the plan of recapitalization on the ground that its true purpose was to benefit the majority shareholders (presumably the Hotchkis family) by providing them with nonvoting stock which they could sell without relinquishing voting control, thereby perpetuating present management policies. The minority shareholders also point out that the new common and preferred stock had been appraised at separate values which, when combined, was substantially less than the book value of the present common stock, and that subsequent sales of the new preferred stock might create additional tax problems for selling shareholders.

Ranch Company sought from the commissioner a permit to amend its articles in accordance with the plan of recapitalization, and to issue new common and preferred stock pursuant thereto. After a hearing on the matter, at which appellants' objections were fully discussed, the commissioner concluded that the proposed plan of recapitalization was "fair, just and equitable." In support of his conclusion, the commissioner found that Ranch Company held large real estate holdings and planned long-term projects to develop that property; that it was desirable to assure Ranch Company's non-shareholder management that there would be sufficient continuity and stability of ownership in the corporation to continue these projects; that the proposed plan would make stock sales to other persons less likely in the event of death; and that the continuity and stability of ownership and management promoted thereby is a proper corporate purpose in a family-held corporation devoted to long-term real estate development.

The commissioner recognized that appraisals of the new stock indicated a decline in value from the present stock, but concluded that this "possible decline" in value was outweighed by other considerations, and that in any event "such valuations are not deemed to be especially significant in a company whose assets consist primarily of real estate and which has always been, and intends to remain, a closely-held family corporation." As for the alleged adverse tax consequences, the commissioner found that the minority shareholders failed to conclusively establish these effects, and concluded that he need not examine the future tax situations of each shareholder in determining whether a proposed stock issuance would be fair, just and equitable.

The minority shareholders then obtained a stay of the commissioner's decision and sought a writ of mandamus from the superior court to annul the decision on the ground that the findings and conclusions failed to support the determination that the plan was fair, just, and equitable. The trial court

found that the commissioner's findings and conclusions were supported by substantial evidence and did not constitute an abuse of discretion.

■ 2. *Code of Civil Procedure section 1094.5 provides for both an independent judgment and a substantial evidence review of administrative decisions.*

Section 1094.5 of the Code of Civil Procedure provides the basic framework by which an aggrieved party to an administrative proceeding may seek judicial review of any final order or decision rendered by a state or local[2] agency. Section 1094.5, subdivision (c), does not establish any single standard for judicial review of the evidentiary basis for agency determinations, but simply states: "Where it is claimed that the findings are not supported by the evidence, in cases in which the court is *authorized by law to exercise its independent judgment* on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the *weight of the evidence;* and in all other cases abuse of discretion is established if the court determines that the findings are not supported by *substantial evidence in the light of the whole record.*" (Italics added).[3]

■ The Legislature originally enacted section 1094.5 as a codification of the then current approach to the judicial review of administrative deci-

[2]This case does not involve a state agency of local jurisdiction (see *Alta-Dena Dairy v. County of San Diego* (1969) 271 Cal.App.2d 66, 75-76 [76 Cal.Rptr. 510]) or a local agency. In *Standard Oil Co.* v. *State Board of Equalization* (1936) 6 Cal.2d 557, 562-563 [59 P.2d 119], this court considered the judicial review of a statewide agency and observed that local agencies would be subject to substantial evidence review. (See *Walker* v. *City of San Gabriel* (1942) 20 Cal.2d 879, 881 [129 P.2d 349, 142 A.L.R. 1383].) The court relied upon a phrase in article VI, section 1, of the California Constitution, which permitted the Legislature to create and thus to vest with judicial authority "such inferior courts as the legislature may establish in any incorporated city or town, township, county, or city and county." Commentators have severely criticized this distinction between statewide and local agencies. (See Kleps, *Certiorarified Mandamus Reviewed: The Courts and California Administrative Decisions—1949-1959* (1960) 12 Stan.L.Rev. 554, 560-562.) In 1950 the California constitutional provision upon which *Standard Oil* relied was repealed so as to deprive the Legislature of any authority to create inferior courts. (Stats. 1949, ch. 153, p. 3291.) Many local agency adjudicative decisions do not substantially affect vested fundamental rights and would thus properly be subject to a substantial evidence review. (See, e.g., *Fascination, Inc.* v. *Hoover* (1952) 39 Cal.2d 260, 264-265 [246 P.2d 656].) Other agency decisions are quasi-legislative in nature and are subject to a very limited judicial review to determine whether the agency's action has been arbitrary, capricious, entirely lacking in evidentiary support, or otherwise unlawful. (Cf. *Pitts* v. *Perluss* (1962) 58 Cal.2d 824, 833 [27 Cal.Rptr. 19, 377 P.2d 83].) Since this case does not concern a local agency decision which substantially affects a vested fundamental right or a decision involving a quasi-legislative matter, we are not called upon to discuss the appropriate judicial review for such decisions.

[3]References hereinafter to Code of Civil Procedure section 1094.5 or section 1094.5, without mention of any code, are to the section quoted above in the text, unless otherwise noted.

sions by writ of mandamus. (*Temescal Water Co.* v. *Department of Public Works* (1955) 44 Cal.2d 90, 105 [280 P.2d 1].) In tracing the origin of section 1094.5, we note that prior to 1936 all administrative decisions were reviewable on writ of certiorari under Code of Civil Procedure section 1068. In *Standard Oil* v. *State Board of Equalization* (1936) 6 Cal.2d 557, 562-565 [59 P.2d 119], however, this court unanimously held that certiorari would not lie to review the decisions of statewide agencies which were not constitutionally authorized to exercise judicial functions. In *Whitten* v. *California State Board of Optometry* (1937) 8 Cal.2d 444 [65 P.2d 1296, 115 A.L.R. 1], we held unanimously that prohibition also would not lie to review statewide agencies empowered to exercise judicial functions.

Then, in 1939, undertaking a new approach to the problem, the court unanimously held that the decisions of statewide agencies which lacked constitutional authority to exercise judicial functions could be reviewed by means of a writ of mandamus. (*Drummey* v. *State Board of Funeral Directors* (1939) 13 Cal.2d 75, 82-85 [87 P.2d 848].) In *Drummey,* two duly licensed embalmers were charged with "unprofessional conduct;" the State Board of Funeral Directors accepted evidence on these charges and suspended the embalmers' licenses.

The *Drummey* court reasoned, "Legislative agencies, with varying qualifications, work in a field peculiarly exposed to political demands. Some may be expert and impartial, others subservient. It is not difficult for them to observe the requirements of law in giving a hearing and receiving evidence. But to say that their findings of fact may be made conclusive where constitutional rights of liberty and property are involved, although the evidence clearly establishes that the findings are wrong and constitutional rights have been invaded, is to place those rights at the mercy of administrative officials and seriously to impair the security inherent in our judicial safeguards. That prospect, with our multiplication of administrative agencies, is not one to be lightly regarded." (*Drummey* v. *State Board of Funeral Directors, supra,* 13 Cal.2d 75, 85 (quoting from *St. Joseph Stock Yards Co.* v. *United States* (1936) 298 U.S. 38, 52 [80 L.Ed. 1033, 1041, 56 S.Ct. 720]).)[4]

---

[4]*Drummey* and its progeny clearly received their initial impetus from *Ohio Valley Water Co.* v. *Ben Avon Borough* (1920) 253 U.S. 287 [64 L.Ed. 908, 40 S.Ct. 527]; *Crowell* v. *Benson* (1932) 285 U.S. 22 [76 L.Ed. 598, 52 S.Ct. 285]; and *St. Joseph Stock Yards Co.* v. *United States* (1936) 298 U.S. 38, 53 [80 L.Ed. 1033, 1042, 56 S.Ct. 720], which held that if a party contends that a rate constitutes a confiscatory deprivation of property without due process of law, the reviewing court must exercise its independent judgment upon constitutional facts giving appropriate weight to the agency's detemination. Professor Davis has contended that "The long debate about de novo review versus restricted review is about ended; the celebrated *Ben Avon* and *Crowell* cases are of little interest except in history. . . ." (Davis, *Scope of Review of Federal Administrative Action* (1950) 50 Colum.L.Rev. 559 (fn. omitted).) Although "Professor Davis' statement probably describes the present status of federal

The *Drummey* court accordingly concluded, "In view of these principles, it necessarily follows that the court to which the application for mandate is made to secure the *restoration of a professional license* must exercise an independent judgment on the facts. . . . [I]n weighing the evidence the courts can and should be assisted by the findings of the board. The findings of the board come before the court with a strong presumption of their correctness, and the burden rests on the complaining party to convince the court that the board's decision is contrary to the weight of the evidence." (13 Cal.2d at p. 85; italics added.)

The later case of *McDonough* v. *Goodcell* (1939) 13 Cal.2d 741, 753 [91 P.2d 1035, 123 A.L.R. 1205], drew a line between the review of an agency decision affecting the restoration of a license and the attempted acquisition of such a right. In *McDonough,* in reviewing the agency decision denying the application for the bail bond license, we held that the court should use the test of substantial evidence, not an independent review of the agency decision. Since the attempt to *obtain* a license did not involve a fundamental, vested right we distinguished *Drummey,* a case in which the aggrieved party already *possessed* such a right—a license to practice his profession. Accordingly, in *Laisne* v. *Cal. St. Bd. of Optometry* (1942) 19 Cal.2d 831, 840 [123 P.2d 457], this court followed *Drummey* in requiring an independent judgment review of an agency decision to revoke an optometrist's vested right to practice his profession. Similarly, in *Dare* v. *Bd. of Medical Examiners* (1943) 21 Cal.2d 790, 799-801 [136 P.2d 304], we

---

administrative law," the "*Ben Avon* case is still being cited and recognized as controlling" by a number of states. (Note, *Independent Review of Administrative Agency Determinations in the States: The Vitality of the Ben Avon Rule* (1953) 102 U.Pa.L. Rev. 108-109, 124 (fns. omitted).) As Professor Jaffe has observed, "it is probably not without significance that, despite many opportunities to do so, the Supreme Court" has not overruled *Ben Avon.* (Jaffe, *Judicial Review: Constitutional and Jurisdictional Fact* (1957) 70 Harv.L.Rev. 953, 984.) Professor Cooper has also found that some state courts "have squarely held in recent times that they will continue to apply the constitutional fact doctrine of the *Ben Avon* case. Particularly significant are decisions in New York, where after a full exploration of the problem, a closely divided court upheld the *Ben Avon* rule; and in Massachusetts, where the court, referring to law review articles proclaiming the demise of the doctrine, observed: 'we would prefer to see the death certificate' before abandoning its long-continued adherence to the rule. At least ten other states have in recent years reaffirmed the *Ben Avon* rule." (2 Cooper, State Administrative Law (1965) 674 (fns. omitted).) Although Professor Davis strongly opposes the *Ben Avon* rule, he also reports the continued state court adherence to that doctrine. (4 Davis, Administrative Law Treatise (1958) § 29.09, at pp. 174-175.)

As to the rate regulation issue specifically involved in the *Ben Avon* case, the California Legislature has required this court to exercise its *independent judgment in* reviewing decisions of the Public Utilities Commission on constitutional questions. (Pub. Util. Code, § 1760; see *Pacific Tel. & Tel. Co.* v. *Public Util. Com.* (1965) 62 Cal.2d 634, 646-648 [44 Cal.Rptr. 1, 401 P.2d 353].)

upheld the trial court's exercise of an independent judgment review in a license revocation case.

Following this historic approach to the judicial review of administrative decisions,[5] the Legislature in 1945 adopted the above principles in Code of Civil Procedure section 1094.5 to authorize the reviewing court to exercise its independent judgment in those cases in which it deemed that it was authorized by law to exercise such judgment. ■ Thus, section 1094.5 empowers this court to establish standards for determining which cases require such independent judgment review and which call for only a substantial evidence review of the entire record. (*Merrill* v. *Department of Motor Vehicles* (1969) 71 Cal.2d 907, 914-915 [80 Cal.Rptr. 89, 458 P.2d 33].) In view of this judicial history, the court would now assert a doubtful prerogative if it were to rule that no cases at all require an independent judgment review and that the Legislature created an empty category in section 1094.5.[6]

[5]Much of the criticism of the independent judgment review of administrative decisions in California arose from the uncertainties engendered by the pre-1945 decisions in this area. (See, e.g., 3 Davis, Administrative Law Treatise, *supra*, § 24.03, at pp. 412-415; McGovney, *The California Chaos in Court Review of the Decisions of State Admınstrative Agencies* (1942) 15 So.Cal.L.Rev. 275; Netterville, *Judicial Review: the "Independent Judgment" Anomaly* (1956) 44 Cal.L.Rev. 262; Turrentine, *Restore Certiorari to Review State-Wide Administrative Bodies in California* (1941) 29 Cal.L. Rev. 275.) Since the enactment of section 1094.5, however, the courts have largely resolved these uncertainties. As one commentator observed, after noting criticism of the independent judgment rule, "On balance, it seems clear to this author that the courts have managed to create a satisfactory, inclusive and workable remedy for the review of quasi-judicial administrative action in Cailfornia." (Kleps, *Certiorarified Mandamus Reviewed: The Courts and California Administrative Decisions—1949-1959, supra*, 12 Stan.L.Rev. 554, 583; see Cal. Law Trends and Developments (1967) p. 331.) Several recent articles have rejected the rigid "substantial evidence" review of all administrative decisions and suggest that courts should carefully scrutinize administrative decisions which substantially affect vested fundamental rights. (See, e.g., Jaffe, Judicial Control of Administrative Action (1965) pp. 191-192 (quoted in fn. 18); Jaffe, *Judicial Review: Constitutional and Jurisdictional Fact* (1957) 70 Harv.L.Rev. 953, 984; Jaffe, *Judicial Review Question of Fact* (1956) 69 Harv.L.Rev. 1020, 1052-1056; Strong, *Judicial Review: A Tri-Dimensional Concept of Administrative-Constitutional Law* (1967) 69 W.Va.L.Rev. 249, 271-278; Vanderbilt, *Administrative Law*, in Annual Survey of American Law (1944) 169, 205-213; Note, *De Novo Judicial Review of State Administrative Findings* (1952) 65 Harv.L.Rev. 1217, 1222-1226.)

[6]Furthermore, the guarantee of an independent judgment review has often salvaged administrative procedures which would otherwise violate due process of law. (See, e.g., *Alta-Dena Dairy* v. *County of San Diego, supra,* 271 Cal.App.2d 66, 77-78; *Hohreiter* v. *Garrison* (1947) 81 Cal.App.2d 384, 402-403 [184 P.2d 323].) In the absence of a limited trial de novo, courts would be confronted with difficult problems of procedural due process which independent review of the evidence might obviate. (See 1 Davis, Administrative Law Treatise, *supra*, § 7.10, at pp. 451-452.)

■ 3. *The doctrine of separation of governmental powers under the California Constitution provides both independent judgment and substantial evidence review of administrative decisions.*

In considering the appropriate standard of judicial review we begin our analysis with two constitutional provisions. Article III of the California Constitution provides for the separation of powers among the three branches of state government: "The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution."[7] Section 1 of article VI states that: "The judicial power of this State is vested in the Supreme Court, courts of appeal, superior courts, municipal courts, and justice courts. All except justice courts are courts of record."

■ The separation of powers doctrine articulates a basic philosophy of our constitutional system of government; it establishes a system of checks and balances to protect any one branch against the overreaching of any other branch. (See Cal. Const., arts. IV, V and VI; The Federalist, Nos. 47, 48 (1788).) ■ Of such protections, probably the most fundamental lies in the power of the courts to test legislative and executive acts by the light of constitutional mandate and in particular to preserve constitutional rights, whether of individual or minority, from obliteration by the majority. (*Marbury* v. *Madison* (1803) 5 U.S. (1 Cranch) 137, 175-178 [2 L.Ed. 60]; *People* v. *Wells* (1852) 2 Cal. 198, 213-214; see *Myers* v. *United States* (1926) 272 U.S. 52, 293 [71 L.Ed. 160, 242, 47 S.Ct. 21] (dissenting opn. of Brandeis, J.); Rostow, *The Democratic Character of Judicial Review* (1952) 66 Harv.L.Rev. 193, 199, 202-204.) Because of its independence and long tenure, the judiciary probably can exert a more enduring and equitable influence in safeguarding fundamental constitutional rights than the other two branches of government, which remain subject to the will of a contemporaneous and fluid majority. (See Cardozo, The Nature of the Judicial Process (1921) 92-94; Hand, *The Contribution of an Independent Judiciary to Civilization* in The Spirit of Liberty (1959) 118-126.)[8]

---

[7]The present case does not involve a statewide agency upon which the California Constitution has specifically conferred adjudicative powers. (See Cal. Const., art. XII; *Boreta Enterprises, Inc.* v. *Department of Alcoholic Beverage Control* (1970) 2 Cal.3d 85, 94 [84 Cal.Rptr. 113, 465 P.2d 1]; *Boren* v. *State Personnel Board* (1951) 37 Cal.2d 634, 637-638 [234 P.2d 981]; *Covert* v. *State Board of Equalization* (1946) 29 Cal.2d 125, 131-132 [173 P.2d 545]; *Rudolph* v. *Athletic Com.* (1960) 177 Cal. App.2d 1, 6 [1 Cal.Rptr. 898]; but see *Ishimatsu* v. *Regents of University of California* (1968) 266 Cal.App.2d 854, 862 [72 Cal.Rptr. 756].)

[8]As Justice Matthews, speaking for the United States Supreme Court, observed: "Arbitrary power, enforcing its edicts to the injury of the persons and property of its subjects, is not law, whether manifested as the decree of a personal monarch or of an impersonal multitude. And the limitations imposed by our constitutional law upon the action of the governments, both State and national, are essential to the preservation of

Possibly the most significant structural change in our government since the date of its founding has occurred in the twentieth century development of a huge administrative bureaucracy. To deal with the manifold problems of modern society these administrators have been delegated substantial quasi-legislative and quasi-adjudicative powers. (Stone, *The Twentieth Century Administrative Explosion and After* (1964) 52 Cal.L.Rev. 513; Molinari, *California Administrative Process: A Synthesis Updated* (1970) 10 Santa Clara Lawyer 274.) Initially, the courts reacted to this executive expansion with the suspicion and fear that the burgeoning bureaucracy would endanger the prevailing concepts of individual rights. (See *United States* v. *Butler* (1936) 297 U.S. 1 [80 L.Ed. 477, 56 S.Ct. 312, 102 A.L.R. 914]; *Bailey* v. *Drexel Furniture Co.* (1922) 259 U.S. 20 [66 L.Ed. 817, 42 S.Ct. 449, 21 A.L.R. 1432].) Yet troubled times forced the courts to recognize that the new administrative tools were essential to cope with new complexities. (See *Labor Board* v. *Jones & Laughlin* (1937) 301 U.S. 1 [81 L.Ed. 893, 57 S.Ct. 615, 108 A.L.R. 1352]; *West Coast Hotel Co.* v. *Parrish* (1937) 300 U.S. 379 [81 L.Ed. 703, 57 S.Ct. 578, 108 A.L.R. 1330]; cf. *Dandridge* v. *Williams* (1970) 397 U.S. 471, 519-521 [25 L.Ed. 2d 491, 521-523, 90 S.Ct. 1153] (dissenting opn. of Marshall, J.).)

Since the 1930's the courts have redefined their role in the protection of individual and minority rights. The courts have realized that in the area of economic due process the will of the majority as expressed by the Legislature and its delegated administrative agencies must be permitted to meet contemporary crucial problems. (Cf. *Weaver* v. *Jordan* (1966) 64 Cal.2d 235, 257-259 [49 Cal.Rptr. 537, 411 P.2d 289] (dissenting opn. of Mosk, J.).) Hence the court has intervened only if the questioned legislation lacks the support of any rational basis. Concomitantly, in order to permit the Legislature and the executive branch to resolve the economic and social dilemmas of the day, the courts have given less emphasis to outmoded rights of property and to shibboleths of freedom of contract. (See *State Board* v. *Thrift-D-Lux Cleaners* (1953) 40 Cal.2d 436, 449-450 [254 P.2d 29] (dissenting opn. of Traynor, J.).)

Courts have explained that powerful economic forces can obtain substantial representation in the halls of the Legislature and in the departments of the executive branch and thus do not impel the same kind of judicial

public and private rights, notwithstanding the representative character of our political institutions. The enforcement of these limitations by judicial process is the device of self-governing communities to protect the rights of individuals and minorities, as well against the power of numbers, as against the violence of public agents transcending the limits of lawful authority, even when acting in the name and wielding the force of the government." (*Hurtado* v. *California* (1884) 110 U.S. 516, 536 [28 L.Ed. 232, 238-239, 4 S.Ct. 111, 292].)

protection as do the minorities: the unpopular religions, the racial sub-
groups, the criminal defendants, the politically weak and underrepresented.
(Rostow, *The Democratic Character of Judicial Review, supra,* 66 Harv.
L.Rev. 193, 203-204; see *Goldberg* v. *Kelly* (1970) 397 U.S. 254, 262-264
[25 L.Ed.2d 287, 295-297, 90 S.Ct. 1011]; *Huntley* v. *Public Util. Com.*
(1968) 69 Cal.2d 67, 73 [69 Cal.Rptr. 605, 442 P.2d 685].)

By carefully scrutinizing administrative decisions which substantially
affect vested, fundamental rights, the courts of California have undertaken
to protect such rights, and particularly the right to practice one's trade or
profession, from untoward intrusions by the massive apparatus of govern-
ment.[9] ▐ If the decision of an administrative agency will substantially
affect such a right, the trial court not only examines the administrative
record for errors of law but also exercises its independent judgment upon
the evidence disclosed in a limited trial de novo.[10]

---

[9]See, e.g., *Yakov* v. *Board of Medical Examiners* (1968) 68 Cal.2d 67 [64 Cal.Rptr.
785, 435 P.2d 553] (physician); *Tringham* v. *State Board of Education* (1958) 50
Cal.2d 507, 508 [326 P.2d 850] (credentialed teacher); *Nardoni* v. *McConnell* (1957)
48 Cal.2d 500, 503 [310 P.2d 644]; *Thomas* v. *California Emp. Stab. Com.* (1952) 39
Cal.2d 501, 504 [247 P.2d 561] (unemployment compensation); *Moran* v. *Board of
Medical Examiners* (1948) 32 Cal.2d 301, 308 [196 P.2d 20]; *Val Strough Chevrolet
Co.* v. *Bright* (1969) 269 Cal.App.2d 855, 860 [75 Cal.Rptr. 363] (automobile
dealer); *Arenstein* v. *California State Bd. of Pharmacy* (1968) 265 Cal.App.2d 179,
186-187 [71 Cal.Rptr. 357] (pharmacist); *Artigues* v. *Cal. Dept. of Employment*
(1968) 259 Cal.App.2d 409, 411 [66 Cal.Rptr. 390] (unemployment compensation);
*Post* v. *Jacobsen* (1960) 180 Cal.App.2d 297, 301 [4 Cal.Rptr. 817] (farm produce
dealer); *McPherson* v. *Real Estate Commissioner* (1958) 162 Cal.App.2d 751 [329
P.2d 12] (realtor); *Yanke* v. *State Department of Public Health* (1958) 162 Cal.App.
2d 600, 606 [328 P.2d 556] (convalescent home); *Thayer* v. *Board of Osteopathic Ex-
aminers* (1958) 157 Cal.App.2d 4, 9 [320 P.2d 28] (osteopath); *Hutchinson* v. *Con-
tractors' State etc. Bd.* (1956) 143 Cal.App.2d 628, 631 [300 P.2d 216] (building
contractor); *Tamble* v. *Downey* (1951) 104 Cal.App.2d 810, 812 [232 P.2d 543] (life
insurance); Note, *supra,* 65 Harv.L.Rev. 1217, 1221-1222. See generally, Universal
Declaration of Human Rights, United Nations General Assembly Resolution, 217A
(111), December 1948.

[10]The trial court must exercise its independent judgment upon the weight of the
evidence produced or which could not, in the exercise of reasonable diligence, have
been produced before the administrative agency and any evidence which might have
been improperly excluded by the administrative agency. (*Dare* v. *Bd. of Medical Ex-
aminers* (1943) 21 Cal.2d 790, 799 [136 P.2d 304]; *General Motors Corp.* v. *Cal.
Unemployment Ins. Appeals Bd.* (1967) 253 Cal.App.2d 540, 545 [61 Cal.Rptr. 483];
*Caro* v. *Savage* (1962) 201 Cal.App.2d 530, 538-539 [20 Cal.Rptr. 286].) After the
trial court has exercised its independent judgment upon the weight of the evidence,
an appellate court need only review the record to determine whether the trial court's
findings are supported by substantial evidence. (*Yakov* v. *Board of Medical Exam-
iners, supra,* 68 Cal.2d 67, 71-73; *Moran* v. *Board of Medical Examiners, supra,* 32
Cal.2d 301, 308; *Post* v. *Jacobsen, supra,* 180 Cal.App.2d 297, 301-302.)

The substantial evidence test requires the trial court to review the entire record.
(*Boreta Enterprises, Inc.* v. *Department of Alcoholic Beverage Control, supra,* 2 Cal.
3d 85, 94; *LeVesque* v. *Workmen's Comp. App. Bd.* (1970) 1 Cal.3d 627, 638-639,
fn. 22 [83 Cal.Rptr. 208, 463 P.2d 432]; see *Universal Camera Corp.* v. *NLRB*

■ If the administrative decision does not involve, or substantially affect, any fundamental vested right, the trial court must still review the entire administrative record to determine whether the findings are supported by substantial evidence and whether the agency committed any errors of law,[11] but the trial court need not look beyond that whole record of the administrative proceedings.

*4. Whether the judicial review of the administrative decision should be restricted to determining if such decision is supported by substantial evidence on the whole record or should be extended to an independent examination by the court, depends on whether or not such decision affects a fundamental vested right of the individual.*

■ The courts must decide on a case-by-case basis whether an administrative decision or class of decisions substantially affects fundamental vested rights and thus requires independent judgment review. (*Merrill* v. *Department of Motor Vehicles, supra,* 71 Cal.2d 907, 915; *Beverly Hills Fed. S. & L. Assn.* v. *Superior Court* (1968) 259 Cal.App.2d 306, 316 [66 Cal. Rptr. 183].) ■ As we shall explain, the courts in this case-by-case analysis consider the nature of the right of the individual: whether it is a fundamental and basic one, which will suffer substantial interference by the action of the administrative agency, and, if it is such a fundamental right, whether it is possessed by, and vested in, the individual or merely sought by him. In the latter case, since the administrative agency must engage in the delicate task of determining whether the individual qualifies for the sought right, the courts have deferred to the administrative expertise of the agency. If, however, the right has been acquired by the individual, and if the right is fundamental, the courts have held the loss of it is sufficiently vital to the individual to compel a full and independent review. The abrogation of the right is too important to the individual to relegate it to exclusive administrative extinction.

■ In determining whether the right is fundamental the courts do not alone weigh the economic aspect of it, but the effect of it in human terms and the importance of it to the individual in the life situation. This approach finds its application in such an instance as the opportunity to continue the

(1951) 340 U.S. 474, 487-490 [95 L.Ed. 456, 467-468, 71 S.Ct. 456].) Once we have imposed the obligation upon the trial court to review the entire record, the additional duty of deciding the matter on the basis of an independent judgment does not entail a significantly more serious burden. (Cf. *In re Winship* (1970) 397 U.S. 358, 366 [25 L.Ed.2d 368, 376, 90 S.Ct. 1068].)

[11]See *Merrill* v. *Department of Motor Vehicles, supra,* 71 Cal.2d 907, 917 & fn. 15; *Yakov* v. *Board of Medical Examiners, supra,* 68 Cal.2d 67, 74-75 & fn. 7; *Mark Hopkins, Inc.* v. *Cal. Emp. Com.* (1944) 24 Cal.2d 744, 750-751 [151 P.2d 229, 154 A.L.R. 1081]; *Bila* v. *Young* (1942) 20 Cal.2d 865, 867 [129 P.2d 364].

practice of one's trade or profession[12]—a right which induced this court's statement in 1939: "it necessarily follows that the court to which the application for mandate is made to secure the restoration of a professional license must exercise an independent judgment on the facts. . . ." (*Drummey* v. *State Bd. of Funeral Directors, supra,* 13 Cal.2d 75, 85.) As Professor Jaffe, a leading authority in the field of administrative law, has written: "The California rule can be justified in so far as it gives additional procedural protection to an interest of great importance as where a professional license has been revoked. The protection may be the more needed to overcome likely prejudices of a professional licensing body against mavericks and unconventional practitioners." Jaffe, Judicial Control of Administrative Action, *supra,* pp. 191-192 (fn. omitted).

In analyzing the fundamental nature of the right asserted, this court, manifesting slighter sensitivity to the preservation of purely economic privileges, has found that the owners of Bay Bridge bonds had no fundamental vested right in preventing the construction of a second toll crossing on the San Rafael-Richmond Bridge (*Faulkner* v. *Cal. Toll Bridge Authority* (1953) 40 Cal.2d 317, 328-330 [253 P.2d 659]), and that a water company had no fundamental vested right to a permit to divert water from the Kern River. (*Temescal Water Co.* v. *Dept. of Public Works* (1955) 44 Cal.2d 90, 103 [280 P.2d 1].) Thus, likewise, in *Beverly Hills Fed. S. & L. Assn.* v. *Superior Court, supra,* 259 Cal.App.2d 306, 316-317, several savings and loan associations with offices in Beverly Hills attempted to protect their interest in being free from additional competition by opposing the license application of another Beverly Hills savings and loan organization. Justice Hufstedler observed for the court that "By no stretch of imagination can petitioners' interest in being free from competition be deemed a 'vested' right. Petitioners do have a vested right in being per-

---

[12]See footnote 9, *supra.* "The right to practice one's profession is sufficiently precious to surround it with a panoply of legal protection." (*Yakov* v. *Board of Medical Examiners, supra,* 68 Cal.2d 67, 75.) In *Meyer* v. *Nebraska* (1923) 262 U.S. 390, 399 [67 L.Ed. 1042, 1045, 43 S.Ct. 625, 29 A.L.R. 1446], the United States Supreme Court listed the right of the individual "to engage in any of the common occupations of life" as one of several fundamental liberties, which also include the right of the individual "to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men." (See *Purdy & Fitzpatrick* v. *State of California* (1969) 71 Cal.2d 566 [79 Cal.Rptr. 77, 456 P.2d 645]; *Endler* v. *Schutzbank* (1968) 68 Cal.2d 162, 169-170 [65 Cal.Rptr. 297, 436 P.2d 297]; *Driscoll* v. *City of Los Angeles* (1967) 67 Cal.2d 297, 309 [61 Cal.Rptr. 661, 431 P.2d 245]; *Bagley* v. *Washington Township Hospital Dist.* (1966) 65 Cal.2d 499, 501-502 [55 Cal.Rptr. 401, 421 P.2d 409]; *Rosenfield* v. *Malcolm* (1967) 65 Cal.2d 559, 561 [55 Cal.Rptr. 505, 421 P.2d 697]; *Fort* v. *Civil Service Commission* (1964) 61 Cal.2d 331, 334 [38 Cal.Rptr. 625, 392 P.2d 385].

mitted to continue operating their existing savings and loan businesses. That right, however, is not here threatened." (259 Cal.App.2d at pp. 316-317.)[13]

As we have noted, in determining whether the right is sufficiently basic and fundamental to justify independent judgment review, the courts have considered the degree to which that right is "vested," that is, already possessed by the individual. (*McDonough* v. *Goodcell, supra,* 13 Cal.2d 741, 753.) In cases involving applications for a license, the courts have largely deferred to the administrative expertise of the agency. (See *So. Cal. Jockey Club* v. *Cal. etc. Racing Bd.* (1950) 36 Cal.2d 167, 174-178 [223 P.2d 1].) Courts are relatively ill-equipped to determine whether an individual would be qualified, for example, to practice a particular profession or trade. (See *Savelli* v. *Board of Medical Examiners* (1964) 229 Cal.App.2d 124, 129, 131-132 [40 Cal.Rptr. 171].) In a case involving the agency's initial determination whether an individual qualifies to enter a profession or trade the courts uphold the agency decision unless it lacks substantial evidentiary support[14] or infringes upon the applicant's statutory[15] or constitutional[16] rights. ■ Once the agency has initially exercised its expertise and determined that an individual fulfills the requirements to practice his profession, the agency's subsequent revocation of the license calls for an independent judgment review of the facts underlying any such administrative decision.[17]

Although we recognize that the California rule yields no fixed formula and guarantees no predictably exact ruling in each case,[18] it performs a

---

[13]We have traditionally utilized a similar type of dichotomy in applying the equal protection clause to the area of economic regulation, on the one hand, and to cases involving "fundamental interests," on the other. (See *In re Antazo* (1970) 3 Cal.3d 100, 110-111 [89 Cal.Rptr. 255, 473 P.2d 999]; *Westbrook* v. *Mihaly* (1970) 2 Cal.3d 765, 784-785 [87 Cal.Rptr. 839, 471 P.2d 847]; *Purdy & Fitzpatrick* v. *State of California, supra,* 71 Cal.2d 566, 578-579.)

[14]See, e.g., *Pinsker* v. *Pacific Coast Soc. of Orthodontists* (1969) 1 Cal.3d 160, 166-167 [81 Cal.Rptr. 623, 460 P.2d 495]; *So. Cal. Jockey Club* v. *Cal. etc. Racing Bd., supra,* 36 Cal.2d 167, 174-176; *McDonough* v. *Goodcell, supra,* 13 Cal.2d 741, 752-753; *Falcone* v. *Middlesex Co. Medical Soc.* (1961) 34 N.J. 582 [170 A.2d 791, 89 A.L.R.2d 952].

[15]Cf., e.g., *California Sch. Employees Assn.* v. *Personnel Commission* (1970) 3 Cal.3d 139, 142 [89 Cal.Rptr. 620, 474 P.2d 436].

[16]See, e.g., *Vogel* v. *County of Los Angeles* (1967) 68 Cal.2d 18, 21 [64 Cal.Rptr. 409, 434 P.2d 961]; *Purdy & Fitzpatrick* v. *State of California, supra,* 71 Cal.2d 566, 582-584.

[17]See, e.g., *Moran* v. *Board of Medical Examiners, supra,* 32 Cal.2d 301, 307-308; *Artigues* v. *Cal. Dept. of Employment, supra,* 259 Cal.App.2d 409, 411.

[18]As Professor Jaffe has stated: "I would conclude against the adoption of a single formula for the scope of review in mandamus. There is as I have noted elsewhere a strong current running in favor of a uniform standard of review. The so-called substantial evidence on the whole record test has received considerable support as a com-

precious function in the protection of the rights of the individual. Too often the independent thinker or crusader is subjected to the retaliation of the professional or trade group; the centripetal pressure toward conformity will often destroy the advocate of reform. The unpopular protestant may well provoke an aroused zeal of scrutiny by the licensing body that finds trivial grounds for license revocation. Restricted to the narrow ground of review of the evidence and denied the power of an independent analysis, the court might well be unable to save the unpopular professional or practitioner. Before his license is revoked, such an individual, who walks in the shadow of the governmental monoliths, deserves the protection of a full and independent judicial hearing.

*5. The court correctly applied to the instant case the test of substantial review of the entire record.*

▆▆▆ We shall explain that the instant administrative decision does not tangentially involve any important or fundamental right and therefore does not call for an independent judgment review. The minority shareholders do not allege any deprivation of their right to a livelihood or a deprivation of their property.[19]

Under the articles of incorporation and the bylaws and the applicable provisions of law, specified majorities of the directors and shareholders may adopt a recapitalization plan unless the commissioner concludes that

---

promise between those who want more and those who want less review. It has become the accepted mode of thinking, 'the rule' defining the relationship between 'the agencies' and 'the courts,' and it has become almost a virtue to embrace it without exception. . . .

"There are reasons for some resistance to the unthinking application of the substantial evidence rule to all mandamus situations. Mandamus is used to control . . . officials of varying degrees of capacity and training. Some will be ward-heelers; others will be trained professionals. A similar variation will obtain in the thoroughness and impartiality of their investigative processes. Certain administrations, because they are set up to deal routinely with a large volume of business, are not well-equipped to try the occasional difficult case. On the other hand, the investigatory processes of, let us say, the police and fire forces may be thoroughly professional even if not completely formal in the adversary sense. . . .

"There are, therefore, cases where it would be inappropriate to apply the substantial evidence rule as it functions, or at least is supposed to function in cases of formal hearing. . . . Most questions of fact as they arise in mandamus are questions of the applicable standard of judgment or questions of degree, or are bound up with a larger administrative whole. Rarely is it sound to decide an administrative controversy by tearing from its context a single factual dispute. We come finally to the conclusion, I think, that it would not be easy to draft or apply a single formula. The courts seem intuitively to have sensed this. They have responded variously from situation to situation rather than by evolving a coherent formula." (Jaffe, Judicial Control of Administrative Action, *supra*, pp. 191-192 (fns. omitted).)

[19]Compare *Endler* v. *Schutzbank, supra,* 68 Cal.2d 162, 169-170 (deprivation of the right to practice one's profession).

the plan is "not fair, just, or equitable to all security holders affected." (Corp. Code, § 25510.)[20] If the commissioner reasonably finds that the plan is fair, just and equitable, and, additionally, that it has received the approval of the required majorities of directors and shareholders, the minority suffer no deprivation of rights, vested or otherwise, by permitting the plan to take effect. Under these circumstances, the minority have received precisely the rights to which their shareholders' contract entitles them, as well as the statutory right to a decision by the commissioner that the plan is fair, just and equitable. (Corp. Code, § 25510.) Section 25510 does not give them the additional right to an independent determination by a trial court that the plan is fair, just, and equitable.

At least two Courts of Appeal have decided that a decision of the commissioner disapproving a recapitalization plan does not affect vested rights.[21] A fortiori, a decision of the commissioner in the present case approving a recapitalization plan would not affect any vested rights. (See *Pacific Mut. Life Ins. Co.* v. *McConnell* (1955) 44 Cal.2d 715, 729 [285 P.2d 636].)

The Legislature has delegated to the Commissioner of Corporations extremely broad authority to determine whether any recapitalization is "in his opinion" "fair, just and equitable." Such an administrative decision necessarily involves overwhelming technical knowledge as to matters of corporate structure, finance, taxation, and business judgment. The trial court must defer to the agency judgment in these matters and clearly should not attempt to substitute its judgment for the expertise of the commissioner. Almost any proposed recapitalization may give rise to differences of opinion as to its wisdom and as to whether it might appear fair, just and equitable. The decision to adopt such a plan must derive initially from the sound business judgment of the directors and the required majority of the shareholders. If that corporate decision receives the lawful approval of the Commissioner of Corporations and his approval enjoys the support of substantial evidence, that resolution should end the matter.

We conclude that the trial court in the present case properly reviewed the commissioner's approval of the corporation's recapitalization plan to determine whether substantial evidence supported the commissioner's determination.

---

[20]References are to Corporations Code prior to its amendment by the 1968 Corporate Securities Law. For the successor provisions to sections 25507 and 25510, see new section 25140.

[21]See *Crestlawn Memorial Park Assn.* v. *Sobieski* (1962) 210 Cal.App.2d 43, 52 [26 Cal.Rptr. 421]; *Western Air Lines, Inc.* v. *Sobieski* (1961) 191 Cal.App.2d 399, 414-415 [12 Cal.Rptr. 719]; cf. *Tu-Vu Drive-In Corp.* v. *Ashkins* (1964) 61 Cal.2d 283, 285-287 [38 Cal.Rptr. 348, 391 P.2d 828].

The trial court reviewed the entire administrative record and found substantial evidence to support the commissioner's lawful determination that the corporate reorganization was "fair, just and equitable."[22] Our scope of review on appeal from such a judgment is identical to that of the trial court. (*Boreta Enterprises, Inc.* v. *Department of Alcoholic Beverage Control, supra,* 2 Cal.3d 85, 94-95; *Merrill* v. *Department of Motor Vehicles, supra,* 71 Cal.2d 907, 916.) Our review of the record discloses ample evidence to support the commissioner's decision and the trial court's judgment.

For example, President Hotchkis testified at length at the administrative hearing regarding the proposed plan of recapitalization, its underlying corporate purposes, and its potential effects upon the corporation and its shareholders. On the basis of the testimony and evidence before him, the commissioner found that the plan would promote a valid corporate purpose, and concluded that the plan was "fair, just and equitable," thereby impliedly rejecting appellants' contention that the purpose and effect of the plan was to perpetuate the control of the majority shareholders to the prejudice of the minority.

The minority shareholders request us to hold as a matter of law that the proposed plan is not "fair, just and equitable," since it could be used to perpetuate majority management and control, could result in a decrease in

---

[22]Code of Civil Procedure section 1094.5 required the trial court to consider "the whole record" in reviewing the evidentiary basis for the administrative decision. (*Boreta Enterprises, Inc.* v. *Department of Alcoholic Beverage Control, supra,* 2 Cal. 3d 85, 94; *LeVesque* v. *Workmen's Comp. App. Bd., supra,* 1 Cal.3d 627, 638-639, fn. 22; see *Universal Camera Corp.* v. *NLRB, supra,* 340 U.S. 474, 487-490.) The trial court in the present case indicated that it attempted to isolate only the evidence which supports the board's findings and thus disregarded relevant evidence in the record. (See *Martin* v. *Alcoholic Bev. etc. Appeals Bd.* (1959) 52 Cal.2d 238, 246 [340 P.2d 1]; Netterville, *The Substantial Evidence Rule in California Administrative Law* (1958) 8 Stan.L.Rev. 563, 575-583.) In *LeVesque* this court refused to apply *Martin* in reviewing a decision of the Workmen's Compensation Appeals Board. (See 1 Cal.3d 627, 637.) In *Boreta* we adopted a substantial evidence review of the entire record for all administrative proceedings under section 1094.5 which do not require an independent judgment approach.

Although the trial court indicated that it attempted to apply the outmoded isolation approach in reviewing the administrative decision, the trial record clearly shows that in reality the court carefully considered all relevant evidence in the record and did not disregard any evidence in support of the minority shareholders. (See *LeVesque* v. *Workmen's Comp. App. Bd., supra,* 1 Cal.3d 627, 638-639, fn. 22.) In any case, our review of the entire record which is identical to that of the trial court (see *Merrill* v. *Department of Motor Vehicles, supra,* 71 Cal.2d 907, 916) reveals substantial evidence to support the administrative decision. Thus, any error in using the "isolation" approach would not constitute grounds for reversing this judgment. (*Warner Constr. Corp.* v. *City of Los Angeles* (1970) 2 Cal.3d 285, 300 [85 Cal.Rptr. 444, 466 P.2d 996].)

the value of appellants' stock, and could have adverse tax consequences to appellants.

The commissioner's findings clearly indicate that the minority shareholders failed to establish the foregoing allegations to the commissioner's satisfaction. Moreover, the commissioner concluded that these considerations were outweighed by the positive advantages to be gained by the corporation and its stockholders through continuity and stability of ownership and management. In making that determination, the commissioner acted within the scope of his statutory authority,[23] was exercising the discretion entrusted to him by the Legislature, and his findings were based upon substantial evidence. Consequently, his decision did not constitute an abuse of discretion.

As the United States Supreme Court observed in *Securities & Exch. Com. v. Chenery Corp.* (1947) 332 U.S. 194, 208 [91 L.Ed. 1995, 2005, 67 S.Ct. 1575], a case involving the statutory authority of the Securities and Exchange Commission to approve certain reorganization plans found to be "fair and equitable," "[t]he application of those criteria, whether in the form of a particular order or a general regulation, necessarily requires the use of informed discretion by the Commission. The very breadth of the statutory language precludes a reversal of the Commission's judgment save where it has plainly abused its discretion in these matters." (See *Doble Steam Motors Corp.* v. *Daugherty* (1924) 195 Cal. 158, 164-165 [232 P. 140]; *Western Airlines, Inc.* v. *Schutzbank,* 258 Cal.App.2d 218, 246 [66 Cal.Rptr. 293]; cf. *American Power & Light Co.* v. *Securities & Exch. Com.* (1946) 329 U.S. 90, 112-114 [91 L.Ed. 103, 119-120, 67 S.Ct. 133].)

The statutory discretion of the commissioner would be entirely abrogated were we to hold that the question of the fairness of securities transactions necessarily constitute questions of law for the courts to decide. By its very nature, the exercise of discretion requires the ability to choose between permissible alternatives. ▆ If the Legislature has conferred upon an administrative officer or agency the authority to apply such broad standards

---

[23]The commissioner's decision does not clearly demonstrate whether he acted under the authority of the general provisions of section 25507 or the more specific provisions of section 25510. Both sections, however, require application of the same discretionary standard, for they both authorize the commissioner to issue his permit if he finds the proposed issuance or exchange is "fair, just and equitable."

We cannot accept minority shareholders' contention that section 25510 contains a narrower standard than section 25507 by reason of the words "to all security holders affected" in the former section. In our view, both sections contemplate that the commissioner should consider the effect of the proposed sale, exchange, or other issuance upon the shareholders affected thereby. In any event, in the instant case the commissioner did consider the effect of the plan upon the minority shareholders and other shareholders, and concluded that any possible adverse effects were outweighed by positive advantages to be gained by the proposed plan.

as the "fair, just and equitable" criteria involved herein, the courts should not substitute their own judgment for that of the agency, but should uphold the administrative decision unless it is arbitrary, capricious, or fraudulent, having no reasonable basis in law or no substantial basis in fact. (*McDonough* v. *Goodcell, supra,* 13 Cal.2d 741, 746-747; *Martin* v. *Alcoholic Bev. etc. Appeals Bd.* (1961) 55 Cal.2d 867, 875-876 [13 Cal.Rptr. 513, 362 P.2d 337]; *Crestlawn Memorial Park Assn.* v. *Sobieski, supra,* 210 Cal.App.2d 43, 52; Netterville, *Administrative "Questions of Law" and the Scope of Judicial Review in California* (1956) 29 So.Cal.L.Rev. 434, 466-468.)

██  Since the commissioner's findings herein were supported by substantial evidence in the light of the entire record, and since his conclusions were reasonable in view of the broad statutory discretion conferred upon him, his decision must be upheld.

At a time in this technocratic society when the individual faces ever greater danger from the dominance of government and other institutions wielding governmental power, we hesitate to strip him of a recognized protection against the overreaching of the state. The loss of judicial review of a ruling of an administrative agency that abrogates a fundamental vested right would mark a sorry retreat from bulwarks laboriously built. Such an elimination would not only overrule decisions long held in California, but destroy a bed-rock procedural protection against the exertion of arbitrary power.

The judgment is affirmed.

Peters, J., Mosk, J., and Sullivan, J., concurred.

**BURKE, J.**—I concur in the majority opinion to the extent it would uphold the trial court's refusal to exercise its independent judgment in reviewing the commissioner's decision approving the recapitalization plan. However, rather than perpetuate the discredited[1] line of cases which have

---

[1]See, e.g., 3 Davis, Administrative Law Treatise (1958), section 24.03, at pages 412-415; Netterville, *Judicial Review: The "Independent Judgment" Anomaly* (1956) 44 Cal.L.Rev. 262; McGovney, *The California Chaos in Court Review of the Decisions of State Administrative Agencies* (1942) 15 So.Cal.L.Rev. 391; McGovney, *Administrative Decisions and Court Review Thereof in California* (1941) 29 Cal.L. Rev. 110; Turrentine, *Restore Certiorari to Review State-Wide Administrative Bodies in California* (1941) 29 Cal.L.Rev. 275; see generally 2 Cal.Jur.2d, Administrative

heretofore precluded our trial courts from employing a uniform substantial evidence review of all administrative decisions, I submit that we should overrule those cases upon reexamining the constitutional and practical considerations which underlie them.

Briefly, the cases have developed the following rules applicable to the review of administrative decisions: Trial courts must exercise their own independent judgment, based upon the weight of the evidence, in reviewing those decisions of statewide, legislatively created administrative agencies which are claimed to have deprived petitioner of his "vested" or "constitutional" rights.[2] However, the trial courts are permitted to employ an ordinary substantial evidence review of all other administrative decisions, including the rulings of "local" agencies[3] and statewide agencies constitutionally empowered to exercise "judicial functions,"[4] even if the agency decision had affected or annulled "vested" rights. Finally, on appeal from the trial court court's decision based upon its exercise of independent judgment, the appellate courts must sustain the decision if it is supported by substantial evidence.[5]

Application of the foregoing rules has often resulted in seemingly anomalous decisions, the apparent by-product of a standard of administrative review made dependent upon the type of agency involved and the type of rights affected. Thus, the findings of a statewide, legislatively created agency in a license *revocation* case (i.e., involving "vested" rights) are subject to independent judgment review by the trial courts, although identical findings by a "local" or "constitutional" agency in such a case may be conclusive if based upon substantial evidence.[6] Moreover, the

---

Law, sections 41-44, sections 219-222; California Administrative Mandamus (Cont. Ed. Bar 1966) sections 5.50-5.75, pages 63-91.

Among other problems, the "independent judgment" test has promoted substantial confusion and uncertainty in the courts. See, e.g., Netterville, *supra;* Kleps, *Certiorarified Mandamus Reviewed: The Courts and California Administrative Decisions— 1949-1959* (1960) 12 Stan.L.Rev. 554.

[2]E.g., *Drummey* v. *State Bd. of Funeral Directors,* 13 Cal.2d 75 [87 P.2d 848]; *McDonough* v. *Goodcell,* 13 Cal.2d 741 [91 P.2d 1035, 123 A.L.R. 1205]; *Laisne* v. *Cal. St. Bd. of Optometry,* 19 Cal.2d 831 [123 P.2d 457]. For a refutation of the doctrine asserted in these cases, see the dissenting opinion of Chief Justice Gibson in *Laisne,* pages 848-869.

[3]E.g., *Walker* v. *City of San Gabriel,* 20 Cal.2d 879 [129 P.2d 349, 142 A.L.R. 1383].

[4]E.g., *Covert* v. *State Board of Equalization,* 29 Cal.2d 125 [173 P.2d 545].

[5]*Moran* v. *Board of Medical Examiners,* 32 Cal.2d 301 [196 P.2d 20]. As pointed out in Justice Traynor's dissenting opinion in *Moran,* at page 317, this rule permits the trial court to ignore the agency's expertise and discretion with impunity, so long as the court's decision is supported by substantial evidence. See also *Western Air Lines, Inc.* v. *Schutzbank,* 258 Cal.App.2d 218, 249 [66 Cal.Rptr. 293].

[6]Compare *Laisne, supra,* footnote 2, with *Walker, supra,* footnote 3, and *Covert, supra,* footnote 4.

findings of that same statewide, legislatively created agency in a license *denial* case also may be conclusive, since no "vested" rights are deemed to be involved.[7]

In addition to the apparent inconsistencies which have arisen under the rule of the foregoing cases, the courts have experienced difficulty in determining what rights are "vested" for purposes of applying that rule, with the result that decisions have been made on an undesirable "case-by-case" basis.[8] Aside from distinguishing between license revocation and. license denial cases, this court has not. attempted to establish any useful guidelines for the lower courts to follow, and the precedent value of our decisions in this area has been minimal.[9] Furthermore, subsidiary problems have arisen in determining whether a particular agency falls within the "local" or "constitutional" categories, thereby permitting ordinary substantial evidence review.[10]

The majority opinion herein unfortunately enhances the confusion and uncertainty of earlier cases by introducing the further concept of "fundamental" rights. Under the majority's approach, to require an independent judgment review not only must a right be "vested," it must also be "fundamental" as well. The majority suggest that in determining whether or not a particular right is "fundamental," the courts should "not alone weigh the economic aspect of it, but the effect of it in human terms and the importance of it to the individual in the life situation." (*Ante*, p. 144.) If the single-factor "vested rights" test has led to confusion and anomaly, consider the difficulties which our trial and appellate courts will have in applying this new test, with its emphasis upon so-called "human terms" and "life situations."

Similarly, the majority state that only a "substantial" effect upon "fundamental, vested rights" requires independent judgment view. The majority offers no standards or guidelines to assist the courts in determining whether a particular right has been "substantially" affected.

---

[7]*McDonough, supra,* footnote 2; *So. Cal. Jockey Club* v. *Cal. etc. Racing Bd.,* 36 Cal.2d 167 [223 P.2d 1]. In his dissent in the latter case, Justice Traynor pointed out that there is no sound basis for distinguishing between the revocation of a license and the denial of a license for an existing business.

[8]*Merrill* v. *Department of Motor Vehicles,* 71 Cal.2d 907, at page 915 [80 Cal.Rptr. 89, 458 P.2d 33]; see generally *Beverly Hills Fed. S. & L. Assn.* v. *Superior Court,* 259 Cal.App.2d 306, 312-318 [66 Cal.Rptr. 183]; Kleps, *supra,* footnote 1, at pages 565-568.

[9]Compare *Thomas* v. *California Emp. Stab. Com.,* 39 Cal.2d 501 [247 P.2d 561] (unemployment insurance benefits), with *Bertch* v. *Social Wefare Dept.,* 45 Cal.2d 524 [289 P.2d 485] (old age benefits).

[10]Kleps, *supra,* footnote 1, at pages 560-565.

Finally, it is evident that the independent judgment test has proven undesirable and impractical in various respects. Although the cases which established the doctrine purported to create a corresponding presumption in favor of the correctness of administrative findings and conclusions,[11] those cases also required the trial court to weigh the evidence and to exercise independent judgment in reviewing those findings and conclusions. Aside from the additional burden cast upon our trial courts in requiring them to perform this reweighing function, the foregoing requirements create conflicting standards and promote further uncertainty and lack of uniformity of decision, for to apply the presumption in favor of the administrative decision necessarily would diminish the independence of the trial courts' review, although to disregard that presumption would ignore the expertise and discretion which, presumably, underlies any such decision.[12]

Turning to the constitutional principles which, according to *Drummey* and *Laisne, supra,* and the majority opinion herein, compel an independent judgment review, the first principle cited by these cases is the "separation of powers" doctrine. As stated by the court in *Laisne, supra*: "The powers of the government of the state are divided into three separate departments —the legislative, executive and judicial. (Article III, section 1, of the state Constitution.) State-wide judicial power may be exercised by only three *enumerated* courts, viz., the Supreme Court, the District Courts of Appeal, and the superior courts. (Article VI, section 1, of the state Constitution.) No other body can exercise state-wide judicial power except as the result of constitutional amendment. [Citations.] If, therefore, some agency with state-wide judisdiction, other than one of the enumerated courts, without sanction by constitutional amendment, exercises or attempts to exercise judicial power, such action is in direct violation of the articles of the state Constitution cited above.

". . . When one department or an agency thereof exercises the complete power that has been by the Constitution expressly limited to another, then such action violates the implied mandate of the Constitution. If, in the instant case, the superior court in the mandate proceedings were limited to the evidence presented before the board, or if the findings of fact by the board were conclusive on the court, then the board would be exercising the complete judicial power reserved to the enumerated courts. The appel-

---

[11]*Drummey* v. *State Bd. of Funeral Directors, supra,* 13 Cal.2d 75, at pages 85-86; *Dare* v. *Bd. of Medical Examiners,* 21 Cal.2d 790, at page 800 [136 P.2d 304].

[12]The commentators assume that the so-called "presumption" will be ignored by the trial courts, since it is totally inconsistent with the concept of an independent judgment review. See, e.g., Kleps, *supra,* footnote 1, at page 577; Netterville, *supra,* footnote 1, at pages 279-280; McGovney, *supra,* footnote 1, 29 Cal.L.Rev. 110, at pages 129-130.

lant's right to practice optometry was a vested property right. [Citations.]" (19 Cal.2d at pp. 834-835.)

The dissent of Chief Justice Gibson in *Laisne* cited numerous cases from California and other jurisdictions rejecting the theory that the separation of powers doctrine prevents the exercise of quasi-judicial functions by administrative agencies.[13]

I do not quarrel with the premise that the legislative branch of state or federal government cannot constitutionally authorize a statewide agency to exercise the basic judicial power reserved to the courts. However, I take issue with *Laisne's* conclusion that the determination of questions of fact, as well as questions of law, is an exclusively judicial function. There is substantial authority to the effect that administrative agencies exercise quasi-judicial factfinding functions as a necessary adjunct to the performance of legislatively delegated duties, and that the exercise of these functions does not violate the doctrine of separation of powers. (1 Davis, Administrative Law Treatise, ch. 1, § 1.09; Forkosch, Constitutional Law (2d ed. 1969) ch. IX, §§ 178-180; McGovney, *supra,* fn. 1, 29 Cal.L. Rev. 110, at pp. 117-129; see *Commission* v. *Havemeyer,* 296 U.S. 506, 516-518 [80 L.Ed. 357, 364-365, 56 S.Ct. 360]; *Crowell* v. *Benson, supra,* 285 U.S. 22, 50; *R. F. C.* v. *Bankers Trust Co.,* 318 U.S. 163, 168-171 [87 L.Ed. 680, 686-688, 63 S.Ct. 515].)[14] In fact, several cases have indicated that the separation of powers doctrine limits the extent to which administrative determinations, including licensing functions, may be sub-

---

[13]19 Cal.2d at pages 859-866; see also Justice Traynor's dissenting opinion in *Dare* v. *Bd. of Medical Examiners, supra,* 21 Cal.2d 790, at pages 811-816. The majority in *Laisne* suggested that the cases from other jurisdictions, or from the federal courts, could be distinguished, since other state constitutions and the U.S. Constitution (art. III, § 1) empower the legislative branch to create "inferior courts," thus permitting the establishment of administrative agencies exercising judicial or quasi-judicial functions. On the other hand, the California Constitution (former art. VI, § 1) empowered our Legislature to create inferior *local* courts; consequently only local administrative agencies could exercise judicial functions in California, absent express constitutional authority. (19 Cal.2d at pp. 846-848.)

This rationale disappeared in 1950, when the reference to "inferior courts" was deleted from article VI, section 1. Moreover, contrary to *Laisne's* assumption it is generally agreed that federal administrative agencies do not derive their quasi-judicial functions from congressional authority to establish "inferior courts"; these agencies are not the constitutional courts contemplated under article III, section 1, of the U.S. Constitution, but are, in effect, "legislative courts" created by a proper delegation of the basic legislative power. (*Crowell* v. *Benson,* 285 U.S. 22, 50 [76 L.Ed. 598, 612, 52 S.Ct. 285]; Forkosch, Administrative Law (1956 ed.), §§ 42-44; McGovney, *supra,* footnote 1, 15 So.Cal.L.Rev. 391, 407-409.)

[14]As stated by Professor Davis, "The California Supreme Court is exceptional in having taken seriously the notion that judicial power cannot constitutionally be conferred upon a tribunal other than a court." (1 Davis, Administrative Law Treatise, *supra,* § 1.09, at p. 66.)

ject to independent judicial review. (See 4 Davis, Administrative Law Treatise, ch. 29, § 29.10, and cases cited.) It is also noteworthy that in 1966 article III of the California Constitution was revised to eliminate the former reference to judicial "functions." Only judicial "power" is covered by new article III.

Moreover, it is apparent that practical necessity precludes continued reliance upon a strict separatist theory of government.[15] The rapid technological growth and economic expansion which resulted in the creation and proliferation of administrative agencies likewise has placed ever-increasing burdens upon the judiciary. Only the most compelling reasons should lead us to perpetuate the uneconomic duplication of effort inherent in an independent judgment review. Likewise, there is no justification whatsoever for permitting the courts to ignore or overrule the administrative decisions of statewide agencies whose experience and expertise best qualify them, and not the courts, to make those decisions. From the foregoing discussion, it seems clear that the separation of powers doctrine does not afford a firm basis for sustaining the independent judgment rule. Therefore, I would conclude that the provisions of the California Constitution do not forbid the administrative exercise of such quasi-judicial functions as making factual determinations which are binding upon the courts if supported by substantial evidence.

The question remains, however, whether a broader review is required in cases involving "vested" or "constitutional" rights.

The *Drummey* and *Laisne* cases, *supra,* invoked the due process clause of the Fourteenth Amendment of the U.S. Constitution to support the theory that an independent judgment review was required of decisions of statewide administrative agencies which are claimed to deprive a litigant of his "vested" or "constitutional" rights. As stated in *Drummey, supra:* "[F]or a purely administrative board to deprive a person of an existing valuable privilege without the opportunity of having the finality of such action passed upon by a court of law, would probably violate the due process clause of the federal Constitution. Although there is some confusion in the federal cases, the more recent decisions by the United States Supreme Court have indicated that if binding fact-finding power is conferred on purely administrative boards, and if the courts in reviewing the administrative board's actions do not exercise an independent judgment on the facts as well as on the law, then the party adversely affected, at least

[15]See 1 Davis, Administrative Law Treatise, *supra,* section 1.09, at pages 67-68; Forkosch, Administrative Law, *supra,* section 44, at pages 46-47.

where constitutional rights are involved, has been deprived of due process." (13 Cal.2d at p. 84.)[16]

The court in *Drummey* and *Laisne, supra,* relied primarily upon two rate cases, *Ohio Valley Water Co.* v. *Ben Avon Borough,* 253 U.S. 287 [64 L.Ed. 908, 40 S.Ct. 527] (referred to in the treatises and legal publications as the *Ben Avon* case), and *St. Joseph Stock Yards Co.* v. *United States,* 298 U.S. 38 [80 L.Ed. 1033, 56 S.Ct. 720]. The *Ben Avon* case held that if one attacks a rate as confiscatory, thereby asserting its unconstitutionality as a deprivation of property without due process of law, the complaining party must be given an opportunity to submit that constitutional question to a judicial tribunal for its independent judgment on both the facts and the law.[17] However, the *St. Joseph* case made it clear that the courts should not disregard the administrative record but must presume in favor of the agency's determination, and that the complainant must make a "convincing showing" that the order involved would result in confiscation. (298 U.S. at p. 53 [80 L.Ed. at p. 1042].)[18]

The *Ben Avon* case has been the subject of considerable discussion in legal publications, and the general consensus appears to be that its holding would no longer be followed by the United States Supreme Court. (4 Davis, Administrative Law Treatise, ch. 29, § 29.09, at pp. 167-168; Gellhorn and Byse, Administrative Law (4th ed.), at pp. 478-481; Stason, *"Substantial Evidence" in Administrative Law,* 89 U.Pa.L.Rev. 1026, at pp. 1032-1033; Benjamin, *Judicial Review of Administrative Adjudication,* 48 Colum.L.Rev. 1, 30; see 2 Cooper, *State Administrative Law,* ch. XIX, § 2 [1965 ed.] at pp. 673-674; Landis, *The Administrative Process,* ch. IV; but see Jaffe, *Judicial Control of Administrative Action* (1965), at pp. 648-652; Jaffe and Nathanson, *Administrative Law,* ch. 3, § A, at pp. 434-438; Joslin and Miller, *Public Utility Rate Making Regulation: A Re-examination,* 43 Va.L.Rev. 1027, 1037-1047.)

The foregoing conclusion is substantiated by later Supreme Court decisions in the area of rate regulation and analogous contexts. (See *R. R. Commission* v. *Oil Co.,* 311 U.S. 570, 575-576 [85 L.Ed. 358, 361-362, 61 S.Ct. 343]; *Power Comm'n* v. *Pipeline Co.,* 315 U.S. 575, 596 [86 L. Ed. 1037, 61 S.Ct. 736]; *Alabama Public Service Comm'n* v. *Southern Ry. Co.,* 341 U.S. 341 [95 L.Ed. 1002, 71 S.Ct. 762]; *American Trucking*

---

[16]The court's reasoning on this point was criticized by the dissenting opinion of Chief Justice Gibson (19 Cal.2d 848, at pp. 855-859) and by the commentators (see McGovney, *supra,* fn. 1, 15 So.Cal.L.Rev. 391, 402-405; McGovney, *supra,* fn. 1, 29 Cal.L.Rev. 110, 134-136.)

[17]Justice Brandeis dissented on this point, joined by Justices Holmes and Clark; see 253 U.S. at page 292 [64 L.Ed. at page 915].

[18]Justice Brandeis concurred in a separate opinion, joined by Justices Stone and Cardozo; see 298 U.S. at page 73 [80 L.Ed at page 1052].

*Assns.* v. *United States,* 344 U.S. 298, 321-323 [97 L.Ed. 337, 361-362, 73 S.Ct. 307]; *Consolo* v. *Federal Maritime Comm'n.,* 383 U.S. 607, 618-621 [16 L.Ed.2d 131, 139-141, 86 S.Ct. 1018]; see also *Preston County Light & P. Co.* v. *Public Serv. Com'n. of W. Va.* (S.D.W.Va. 1969) 297 F.Supp. 759, 766; *N.Y., N.H. & H.R. Co., Bondholders' Committee* v. *United States* (S.D.N.Y. 1968) 289 F.Supp. 418, 427, fn. 5; *Cardinale Trucking Company* v. *United States* (D.N.J. 1964) 232 F.Supp. 339, 343-344.)

Moreover, neither the United States Supreme Court nor the lower federal courts has ever applied the so-called "Ben Avon" rule of independent judgment review to license or permit decisions such as those presented in *Drummey, Laisne,* or the instant case.[19] Instead, these courts have upheld administrative findings of fact in such cases if supported by substantial evidence. (*Commission* v. *Havemeyer, supra,* 296 U.S. 506, 516-518 [cancellation of franchise]; *Federal Communications Commission* v. *WOKO, Inc.,* 329 U.S. 223, 226-229 [91 L.Ed. 204, 207-208, 67 S.Ct. 213] [denial of license renewal]; *Securities Comm'n* v. *Chenery Corp.,* 332 U.S. 194, 207-208 [91 L.Ed. 1995, 2004-2005, 67 S.Ct. 1575] [disapproval of reorganization plan]; *Cameron* v. *Civil Aeronautics Board* (7th Cir. 1944) 140 F.2d 482, 483, cert. den. 323 U.S. 716 [89 L.Ed. 576, 65 S.Ct. 43] [license restriction]; *Nadiak* v. *Civil Aeronautics Board* (5th Cir. 1962) 305 F.2d 588, 592, cert. den. 372 U.S. 913 [9 L.Ed.2d 722, 83 S.Ct. 729] [revocation of license]; *Irish* v. *Securities & Exchange Commission* (9th Cir. 1966) 367 F.2d 637, 638, cert. den. 386 U.S. 911 [17 L.Ed.2d 784, 87 S.Ct. 860] [revocation of license]; *Marketlines, Inc.* v. *Securities and Exchange Commission* (2d Cir. 1967) 384 F.2d 264, 267, cert. den. 390 U.S. 947 [19 L.Ed.2d 1136, 88 S.Ct. 1033] [revocation of license].)

The foregoing cases compel the conclusion that the United States Constitution does not require an independent judgment review of all administrative decisions which affect or destroy "vested" or "fundamental" rights and that the broad distinction between "vested" and "nonvested" rights established by the earlier California cases has no sound constitutional basis, and therefore should be rejected unless there are strong practical reasons for retaining it.[20]

---

[19]Indeed, the majority in *Laisne, supra,* expressly recognized that the *Ben Avon* and *St. Joseph* cases appeared to be exceptions to the general rule in the federal courts permitting a substantial evidence review. (19 Cal.2d at p. 846.)

[20]The "Ben Avon" rule may or may not survive in the rate regulation area (compare 4 Davis, Administrative Law Treatise, *supra,* § 29.09, at pp. 167-168, 172-174, with Jaffe and Nathanson, *Administrative Law, supra,* pp. 434-438), but that question is not before us in the instant case. In California the Legislature adopted an independent judgment standard in providing for review of decisions of the Public Utilities Com-

I can conceive of no such reasons. On the contrary, I believe that adoption of a uniform rule of substantial evidence review will have several salutary effects: First, a uniform rule would end the present confusion and uncertainty involved in determining which agencies, and which administrative decisions, are subject to independent judgment review. Second, a uniform rule would eliminate the difficulties inherent in applying the independent judgment test and thereby promote uniformity of decisions. Third, a uniform rule would enhance judicial efficiency and economy by relieving our trial courts of the unnecessary burden of reweighing the administrative record and exercising independent judgment thereon.[21] Finally, and most important, a uniform rule would assure that administrative expertise and discretion are accorded due weight and consideration by the courts.

It has been suggested that the independent judgment rule evolved at a time of judicial distrust of, and hostility toward, the administrative process.[22] However, with the subsequent adoption of the California Administrative Procedure Act[23] and the extensive safeguards governing administrative adjudication by statewide agencies,[24] including full provision for qualified hearing officers and procedural due process, the Legislature has substantially reduced the risks of administrative abuse. Administrative boards exercising quasi-judicial powers have become a respected, integral part of our system of government.[25]

Furthermore, the use of a substantial evidence review would not, of course, render administrative decisions immune from judicial scrutiny. Although confined to a substantial evidence test in reviewing the decisions

---

mission which are claimed to have violated constitutional rights. (Pub. Util. Code, § 1760.) However, this provision does not require a judicial reweighing of all facts underlying the commission's decision. (See *Pacific Tel. & Tel. Co.* v. *Public Util. Com.,* 62 Cal.2d 634, 646-647 [44 Cal.Rptr. 1, 401 P.2d 353], and cases cited.)

[21]The Legislature ultimately could provide for the direct appeal of administrative decisions to the Courts of Appeal, thereby vesting the appellate function in courts experienced in performing that function.

As stated in the *Drummey* case, *supra,* which originated the independent judgment rule and selected mandamus as the appropriate review procedure: "Normally application for such writs should be filed in the trial courts, whose normal function it is to determine . . . controverted issues of fact." (13 Cal.2d 75, 86.) If a uniform substantial evidence review were adopted, the Court of Appeal rather than the trial court would be the logical forum to perform the review function. Preliminary review by the trial court would be superfluous and uneconomic in cases requiring no determination of controverted issues of fact.

[22]Netterville, *supra,* footnote 1, at page 264.

[23]Government Code, section 11370 et seq.

[24]Government Code, section 11500 et seq.

[25]It is indeed anomalous that "local" agencies, whose procedures are not governed by the Administrative Procedure Act, are subject only to a substantial evidence review, even though "vested" rights are involved. See text discussion at footnote 6, *ante.*

of "local" or "constitutional" agencies, the courts heretofore have managed to correct abuses of discretion by these agencies in a wide variety of situations.[26]

Similarly, the substantial evidence rule has never precluded this court from correcting abuses of discretion or other injustices upon review of the decisions of the Workmen's Compensation Appeals Board, even though those decisions inevitably affect or concern the "fundamental" right of an injured employee to just compensation.

Under Code of Civil Procedure section 1094.5, subdivisions (b) and (c), the courts would retain the power to determine whether an agency "has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion." An abuse of discretion is established if the agency "has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by . . . substantial evidence in the light of the whole record."[27]

I would conclude that the safeguards provided by the Administrative Procedure Act and by section 1094.5 are sufficient to allay any concern that adoption of a uniform substantial evidence review might have undesirable consequences. The courts will retain broad power to prevent arbitrary and capricious administrative action.

Therefore, since their reasoning is unsupported by convincing constitutional or practical considerations, this court should overrule the California cases discussed above, to the extent that they require the trial courts to exercise their own independent judgment, based upon the weight of the evidence, in reviewing the decisions of statewide, legislatively created administrative agencies which are claimed to deprive one of his "vested" or "fundamental" rights.

Coughlin, J.,* concurred.

---

[26]See, e.g., *Boreta Enterprises, Inc.* v. *Department of Alcoholic Beverage Control*, 2 Cal.3d 85, 94-95 [84 Cal.Rptr. 113, 465 P.2d 1]; *Harris* v. *Alcoholic Bev. etc. Appeals Bd.*, 62 Cal.2d 589, 594-595 [43 Cal.Rptr. 633, 400 P.2d 745]; *Shepherd* v. *State Personnel Board*, 48 Cal.2d 41, 50-51 [307 P.2d 4]; *Stoumen* v. *Reilly*, 37 Cal.2d 713, 716-717 [234 P.2d 969]; *English* v. *City of Long Beach*, 35 Cal.2d 155, 158-159 [217 P.2d 22, 18 A.L.R.2d 547].

[27]Under section 1094.5, the trial courts must consider "the whole record" and may not isolate only the evidence which supports the board's findings and thus disregard relevant evidence in the record. (See *LeVesque* v. *Workmen's Comp. App. Bd.*, 1 Cal.3d 627, 638-639, fn. 22 [83 Cal.Rptr. 208, 463 P.2d 432]; cf. *Universal Camera Corp.* v. *NLRB*, 340 U.S. 474 [95 L.Ed. 456, 71 S.Ct. 456]; see generally Netterville, *The Substantial Evidence Rule in California Administrative Law*, 8 Stan.L.Rev. 563, 575-583; Kleps, *supra*, footnote 1, at pp. 578-580.)

*Assigned by the Chairman of the Judicial Council.

**MOSK, J.**—I concur. Justice Tobriner's opinion for the majority not only properly relates the current law in California, but expresses a sensitive and sound public policy.

There is only one qualification attached to my approval. I would find it difficult, in an appropriate factual context, to recognize vested or fundamental rights—as those terms are used in the majority opinion—in one who is licensed as a member of a profession or state-regulated vocation but not in another who seeks a license to practice his calling, particularly if the latter is equally well qualified by virtue of his investment of time and treasure. (Cf. *Hallinan* v. *Committee of Bar Examiners* (1966) 65 Cal.2d 447, 452-453, fn. 3 [55 Cal.Rptr. 228, 421 P.2d 76].) The suggested distinction arises primarily because of chronology, a circumstance that seems entitled to a minimum of weight. (See *So. Cal. Jockey Club* v. *Cal. etc. Racing Bd.* (1950) 36 Cal.2d 167, 180 [223 P.2d 1] (dissenting opn. of Traynor, J.).)

Professor Jaffe is quoted as observing that the California rule may be "needed to overcome likely prejudices of a professional licensing body against mavericks and unconventional practitioners." (*Ante,* p. 145.) I agree wholeheartedly. But not all mavericks, innovators and iconoclasts are already admitted to regulated vocations and alone in peril of prejudiced disciplinary proceedings. In these days of widespread impatience with and irreverence for traditional schools of thought one need not be prescient to anticipate future incidents resulting from prejudicial attitudes by official boards and commissions toward those seeking admission to the same occupations.

In concurring with the majority, I do not choose to be foreclosed in the future from considering whether a rejected applicant, like a disciplined licensee, has been denied fundamental rights. I would apply substantially the same standards of review to both.